**Affirmed and Opinion filed April 23, 2013.**



**In the**

# Fourteenth Court of Appeals

---

### NO. 14-11-00960-CR

---

### RODERICK FOUNTAIN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 208th District Court
Harris County, Texas
Trial Court Cause No. 1220863**

---

## O P I N I O N

Appellant Roderick Fountain was charged by indictment with the first-degree felony murder of his three-year-old son, Kendrick Jackson. A jury found him guilty of the charged offense, made affirmative findings on two prior enhancement felonies, and assessed punishment at life in prison. Appellant appeals his conviction, arguing that (1) the evidence is legally insufficient to prove the corpus delicti of felony murder, and that (2) the evidence is legally insufficient

to prove the act of striking the complainant (a) was clearly dangerous to human life and (b) was a contributory cause of the complainant's death. Appellant highlights the fact that no remains were recovered, and the lack of forensic evidence, eyewitnesses, and expert testimony. We conclude that the evidence is legally sufficient to satisfy the corpus delicti of felony murder and to support appellant's conviction. Therefore, we affirm the trial court's judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On Friday, April 7, 2006, at 11:19 a.m., appellant Roderick Fountain called 9-1-1 to report his three-year-old son, Kendrick Jackson, missing. Despite a massive search by police and civilian volunteers that spanned several days and many miles, Kendrick was never found.

*Appellant's initial version of what happened*

Appellant's original story to police was that at 5:15 a.m., his wife left their Wilcrest Drive apartment in West Houston to go to work and dropped off their two children at daycare, leaving appellant and Kendrick alone at the apartment. Kendrick, who ordinarily lived with his mother, Keyanna Jackson, was visiting appellant. Appellant told police he woke up about 9:00 a.m. and went upstairs to do laundry. Appellant was upstairs for about five minutes. When he came back downstairs at about 9:30 a.m. or 10:00 a.m., Kendrick was missing and the front door was ajar. Appellant told police he searched for Kendrick for about an hour and then called to report him missing.

The responding officers noticed that appellant seemed unusually calm, and was not distressed or worried that his child could not be located. Later, when a homicide detective remarked that appellant did not seem concerned about his son being missing, appellant responded that Kendrick was just lost and "he'll be fine."

2

*Testimony from others at the apartment complex*

On April 7, one of appellant's neighbors walked to the store across the street from the complex at about 10:00 a.m. When the neighbor returned at about 10:30 a.m., she did not notice anything unusual or see Kendrick outside. The neighbor did not see appellant walking around calling for Kendrick nor did he come ask her about Kendrick, even though their children sometimes play together. When the neighbor left her apartment just after noon, she encountered appellant and asked how he was doing. Appellant said he was "doing fine" and did not tell her that Kendrick was missing or ask her if she had seen him.

According to one of the apartment complex's maintenance men, when he arrived to work at 9:00 a.m. on April 7, the complex's security gate was working properly. The complex has a perimeter fence, and the only way in or out is through the gate. That day, the maintenance man was overseeing renovations in a location where he could see appellant's apartment door. He did not see appellant's door open or ajar, and did not hear or see appellant calling or looking for a lost child. He said that appellant seemed "nonchalant" and unconcerned when appellant was talking to police.

*Appellant's revised version of what happened*

Later in the afternoon on April 7, appellant voluntarily accompanied homicide detectives to the downtown police station to give his statement. By then, police had obtained his cell phone records. According to the records, appellant's cell phone was hitting off cell towers along the East Freeway to Baytown between the hours of 4:00 a.m. and 5:00 a.m. Baytown is approximately 55 miles from appellant's apartment. When confronted with the records, appellant admitted that he was not at home that morning, but was at the homes of several other women and did not tell the truth because he did not want his wife to find out about the affairs.

3

Appellant said he left his apartment about 4:00 a.m. to visit Walita Gordon's apartment, which was about five minutes away from appellant's apartment. Appellant told police that Kendrick went with him. Appellant stated he arrived at Gordon's apartment at 4:30 a.m., stayed until approximately 6:30 a.m., and then went home. However, appellant's cell phone records indicated that at 4:30 a.m., he was headed toward Baytown and he did not arrive at Gordon's apartment until approximately 6:40 a.m.

Appellant said that after returning to his apartment from Gordon's, he left again and drove to Trenel Smith's apartment in Northeast Houston, which was about 25 minutes away from appellant's apartment. Appellant indicated that Kendrick was with him. Appellant said he arrived at 7:30 a.m., took Smith's children to school, then returned to her apartment and had sex with her. Appellant said he left Smith's apartment at 9:30 a.m., got home at 10:00 a.m., and went upstairs to wash clothes. When he came downstairs at 10:30 a.m., appellant noticed Kendrick was missing. However, appellant's cell phone records indicated that at 10:27 a.m., he was at Smith's apartment. According to his cell phone records, appellant was back at his apartment at 11:14 a.m.

When confronted with the cell phone records that showed appellant traveling to Baytown, appellant claimed to not know where Baytown was. When confronted with the fact that appellant is from New Orleans and one has to drive east on Interstate 10 through Baytown to reach New Orleans, appellant admitted that he was in the area and said that he was looking for a female friend, Alisha Mackie, who lived in Baytown.

*Testimony from appellant's girlfriends*

Police interviewed Mackie, Gordon, and Smith; they all testified as State witnesses at appellant's trial.

4

*Alisha Mackie*: According to Mackie, and consistent with the cell phone records, appellant called Mackie's cell phone three times around 4:30 a.m. on April 7, but she did not answer the calls.

*Walita Gordon*: Appellant is the father of Gordon's daughter. Gordon testified that on Wednesday, April 5, she borrowed appellant's truck to get to and from work, and appellant was watching their daughter. That same day, appellant called Gordon at work and told her that she was going to be mad because there was a hole in the bathroom wall of her apartment. Gordon testified she asked appellant what happened, and he said that "he hit Kendrick because he peed on hisself [sic]" and Kendrick's head hit the wall. The hole was the approximate size and height of Kendrick's head. When interviewed in April 2006, Gordon did not tell police what appellant had said about how the hole in the wall happened; she told the prosecution about appellant's statement a month before his trial.

On April 6, Gordon again borrowed appellant's truck to get to and from work, and appellant again watched their daughter. Appellant had the hole in the wall repaired while Gordon was at work. Gordon said appellant arranged for his friend, Leonard Patrick, to fix the hole. Gordon testified that appellant returned their daughter back to Gordon's apartment after 10:00 p.m., shortly after Gordon got off from work.

Gordon testified that appellant came to her apartment about 6:00 or 6:30 a.m. on Friday morning, April 7. Gordon was in her bedroom asleep when appellant called her to be let in. Kendrick was not with appellant. Gordon also testified that when she was being questioned at the police station on April 8, appellant tried to convince her to say that Kendrick had been with him when he visited her apartment Friday morning.

5

*Trenel Smith*: Smith had been friends with appellant for over 12 years and, in 2006, had an ongoing relationship with him. On the evening of April 5, the Wednesday before Kendrick disappeared, appellant and Kendrick came over to Smith's apartment so appellant could hook up her surround sound. Kendrick had a "busted lip" and a "knot" or "hickey" on the right side of his forehead slightly smaller than a golf ball. Smith asked appellant what happened, and he said Kendrick "caught a whooping from pissing his pants in the car." Appellant also told Smith that Kendrick fell in someone's house and hit his head on the wall, and that he fell on a step and "busted" his lip. Smith tried to comfort Kendrick and offered him a snack, but Kendrick was very quiet and would not talk.

About 7:30 a.m., on April 7, Smith called appellant and asked him to take her children to school. According to Smith, appellant arrived at her apartment just after 8:00 a.m., drove her children to school, then returned to her apartment and had sex with her. Kendrick was not with him. When appellant left, Smith noticed he left his shirt; she called him, and appellant returned to pick up the shirt at about 10:30 a.m.

Smith said appellant called her four times on Saturday morning, April 8. When Smith finally answered, appellant, who was whispering and speaking quickly, told her that if the police asked, to tell them that Kendrick was with him when appellant came to Smith's apartment Friday morning. When Smith asked appellant "why," he told her not to worry about it. At this point, Smith said she did not know that Kendrick was missing. Smith initially told police that appellant and Kendrick had visited her apartment on the morning of April 7. Smith said that she lied because appellant was her friend and asked her to, and she did not know the seriousness of the situation. Smith testified that the last time she saw Kendrick was Wednesday, April 5.

6

*Testimony from Kendrick's mother, Keyanna Jackson*

Kendrick's mother, Keyanna Jackson, also testified at appellant's trial for the State. Jackson was 17 years old, in 11th grade, when she met appellant. Appellant was several years older than Jackson, and she knew he had children but did not know he was married. About a year after they started having sex, Jackson discovered she was pregnant. After Kendrick was born on March 16, 2003, appellant visited Jackson to have sex with her and drop off money, but did not build a relationship with Kendrick.

Jackson testified to several episodes of harsh, physically abusive treatment of Kendrick by appellant. When Kendrick was one year old, appellant responded to Kendrick's crying by getting angry and shaking him. When Kendrick did not stop crying, appellant shut him in a dark bathroom and yelled at him to stop crying. When that did not work to stop Kendrick's crying, appellant folded his belt into a loop and hit Kendrick hard several times on the buttocks. As Kendrick cried louder, appellant got angrier and hit him harder. Jackson testified that appellant's hitting left marks and bruises through Kendrick's blue jeans and diaper. After that, Kendrick became afraid and cried every time he saw appellant. This annoyed appellant, who told Kendrick to "hush up" every time he saw him.

When Kendrick was 18 months old, appellant again hit him on the buttocks with appellant's belt because Kendrick was crying. In February 2006, about two months before Kendrick disappeared, appellant took Kendrick for the day to get his hair cut. Appellant decided to keep Kendrick overnight. When appellant returned Kendrick, Jackson saw two bruises on his face. When Jackson took Kendrick's clothes off, there were "really really bad," "up to the point it's undescribable [sic]" bruises—"the worst marks" that she had ever seen—all over his lower back, buttocks, and thighs. Kendrick flinched when Jackson put lotion on the bruises.

7

When Jackson asked Kendrick about the bruises, he said, "Daddy." Jackson confronted appellant, who said Kendrick was "doing his usual crying." Jackson asked appellant if he "could stop" and appellant said "okay." Jackson stated that she did not call police because she felt strongly about Kendrick growing up with a father.

In March 2006, shortly before Kendrick's third birthday, appellant and Jackson took Kendrick to the mall. At one point, Kendrick urinated on himself, and appellant became mad. Kendrick started crying, and appellant told him to stop. When Kendrick continued to cry, appellant shook him and punched him "in the chest hard." Later, while Jackson was cooking dinner, appellant gave Kendrick a bath. Jackson heard continuous splashing; appellant was holding Kendrick's head under the water while Kendrick's arms and legs were flailing as he struggled. Jackson confronted appellant, and he "just turned around and gave [her] this evil look." Jackson quickly removed Kendrick from the water; Kendrick was shaking, crying, and repeating "yeah, yeah, yeah." Jackson took Kendrick away, held him and dressed him for bed. Kendrick wanted to sleep, but appellant got him out of bed and sat him at the table. When Kendrick did not want to eat, appellant became angry, grabbed his face, "squeezed his cheeks," and force-fed him. Kendrick was crying, and appellant shoved "every bit of his food" into his mouth.

Jackson testified that appellant took Kendrick for a visit Friday, March 31. Kendrick was originally going to spend just the weekend, but appellant asked to keep him longer. One day during that week, before the Friday when Kendrick went missing, appellant came to Jackson's house for additional clothes for Kendrick. Jackson saw that Kendrick had a "knot on his forehead and a busted lip." Appellant told Jackson that Kendrick fell down the stairs. Jackson has not seen Kendrick since that day.

8

According to Jackson, Kendrick never would have opened the door and wandered outside by himself. Appellant never gave Jackson a straight answer about what happened to Kendrick. Jackson admitted that she did not tell police about the abuse until about a month after Kendrick disappeared. Jackson did not want to believe that appellant could have harmed Kendrick, but also "she was scared of [appellant] for what he might have done."

*Testimony from Leonard Patrick*

Police interviewed Leonard Patrick, and he also testified as a State witness at appellant's trial. Patrick and appellant were "good friends." On Thursday, April 6, appellant called and asked him if he had time to fix a hole in the wall at Gordon's apartment. Appellant arranged to pick up Patrick and Patrick's adult cousin, Dwight, at Patrick's house.

Appellant arrived at Patrick's home with three of his children, including Kendrick. All the children exited appellant's car except for Kendrick. Appellant discovered that Kendrick had "pooped on himself" while he was in the car. Appellant got angry and starting hitting and "whooping the baby" with his open hand. Kendrick was crying because "it hurted [sic] the kid, you know, to get whooped." Patrick's other adult cousin, Bernadine, pushed appellant aside, stopped him from hitting Kendrick, and carried Kendrick inside to clean him up. Bernadine was angry because she did not feel like appellant had to "whoop" Kendrick. Patrick also did not think appellant had to whoop Kendrick. When Bernadine returned with Kendrick, he had stopped crying. Appellant, Patrick, Dwight, and the children then went to Gordon's apartment where Patrick and Dwight fixed the hole in the bathroom wall. Patrick testified that the hole was smaller than a piece of paper and about three feet off the ground.

After the hole was fixed, they left Gordon's apartment and went to

9

appellant's apartment to watch a basketball game on television. They arrived at appellant's apartment at about 7:00 or 8:00 p.m. Patrick testified that the men were watching the game in the living room and Kendrick was in a bedroom off the living room. Patrick said that appellant went into the bedroom where Kendrick was and Kendrick started crying. Patrick stated that he could hear appellant "whooping" Kendrick, telling him to "shut up" and "shut his mouth." Patrick said that appellant was angry, and Patrick could hear Kendrick crying and then the crying stopped. After the crying stopped, appellant "stayed in there a little bit" and "then after a while came out," leaving the bedroom door open. When appellant came out, Patrick and Dwight told him they were ready to leave, and appellant also was ready for them to leave. Instead of driving them to back to Patrick's house, about 30 minutes away from appellant's apartment, appellant drove them back to Gordon's apartment, where appellant's truck was parked. Appellant told Patrick they could drive themselves home in his truck. Patrick was surprised that appellant let them take the truck—"his baby"— as he had never done that before. Patrick did not see Kendrick again that night or ever again.

*Appellant's extrajudicial confessions*

*Ricky Johnson*: Police arrested appellant on April 9, pursuant to a warrant for giving a false statement. While in custody on April 10, appellant was placed briefly in a police car alone with Ricky Johnson, who was on parole for sexual assault and being interrogated for unrelated assault and homicide offenses. Johnson testified at appellant's trial as a witness for the State. Johnson had a brief conversation with appellant in the car. Appellant made various statements, including "they're just messing with me," "they're not going to find him anyway," and "I'm tired of him peeing on himself." Appellant also said that he "hit him" and "he deserved what he got." Johnson testified that after he saw a news story on

10

television about appellant's missing son while he was in Harris County jail, he immediately wrote a letter to police about what appellant had said in the car, but police never contacted Johnson and he did not talk about the letter until 2009 when Johnson was interviewed by the prosecutor. Johnson stated that he was not promised anything and received no benefit from testifying.

*Douglas Fusilier*: Another witness for the State was Douglas Fusilier. Fusilier testified that in summer 2008, when they were incarcerated at the same federal correctional facility in Beaumont, Fusilier, appellant,[1] and another inmate had a conversation about appellant's missing son. According to Fusilier, during the conversation, appellant told them that (1) he "accidentally" killed his son; (2) appellant's son died when appellant lost his temper and struck the child; (3) appellant lost his temper because "[t]he child shit on himself"; (4) appellant struck the child on the cheek and "dented" him; (5) after appellant hit the child, the child "wasn't moving"; (6) it happened at appellant's home on a Thursday night; (7) appellant disposed of his son's body near a boat ramp, and the body would not be found. Fusilier testified that appellant told them he panicked, put the child in the bathtub, and later wrapped the child's body in garbage bags and put it in the trunk of his car. Then appellant started "in a panic" driving home toward New Orleans, but he did not make it to New Orleans and turned off the road on the east side of Houston: "somewhere he had taken the kids before . . . near a boat ramp." Fusilier then wrote a letter to homicide detectives. When police interviewed Fusilier in October 2008, Fusilier already was scheduled to be released on his various bank robbery and theft convictions in December 2008. Fusilier stated he came forward because he has a son.

---

[1] In 2006, appellant was convicted in federal court of possession of a firearm after having been convicted of three felony offenses that are either violent felonies or serious narcotics offenses.

In June 2009, appellant was charged with the felony murder of Kendrick Jackson. The indictment charged appellant with committing the felony offense of injury to a child by striking the complainant with his hand, on or about April 7, 2006, and while in the course of the commission of injury to a child, committing an act clearly dangerous to human life, namely, striking the complainant with his hand, thereby causing the death of Kendrick Jackson. The indictment alternatively alleged that appellant committed felony murder by striking the complainant with an unknown object. The jury found appellant guilty of the charged offense. The jury found the two prior felony-enhancement paragraphs true and sentenced appellant to life in prison. Appellant timely appealed.

On appeal, appellant brings three issues. First, he argues that the evidence, excluding appellant's extrajudicial confessions, is legally insufficient to establish the corpus delicti of felony murder. Then in two related issues, appellant argues that the evidence is legally insufficient to establish that his act of striking the complainant constituted an act "clearly dangerous to human life," and to establish that such striking was a contributory cause of the complainant's death.

## II.     ANALYSIS

### A. Legal sufficiency of the evidence to show corpus delicti of murder

Appellant first argues that the evidence, independent of appellant's extrajudicial confessions to Johnson and Fusilier, is legally insufficient to show the corpus delicti of felony murder, that Kendrick was killed by the criminal act of someone. Appellant contends that, at most, the evidence shows that Kendrick "disappeared in suspicious circumstances." We disagree.

#### 1.  Applicable law and standard of review

The corpus delicti rule holds that no criminal conviction can be based upon a

12

defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to establish the corpus delicti. *Fisher v. State*, 851 S.W.2d 298, 302 (Tex. Crim. App. 1993) (citations omitted). The corpus delicti of any crime "simply consists of the fact that the crime in question has been committed by someone." *Id.* at 303. The corpus delicti of murder is established if the evidence shows (1) the death of a human being (2) caused by the criminal act of another. *Id.* (citations omitted); *Herrero v. State*, 124 S.W.3d 827, 831 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (citing *Fisher*, 851 S.W.2d at 303). The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti or render the corpus delicti more probable than it would be without the evidence. *Fisher*, 851 S.W.2d at 302–03 (citations omitted); *Gribble v. State*, 808 S.W.2d 65, 71–72 (Tex. Crim. App. 1990), *cert. denied*, 501 U.S. 1232 (1991) ("[T]he quantum of independent evidence necessary to corroborate the corpus delicti in a criminal prosecution relying upon the extrajudicial confession of an accused need not be great."). The State may prove the corpus delicti by circumstantial evidence. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997); *Gribble*, 808 S.W.2d at 72–73. The State's inability to produce or identify the body or remains does not preclude a murder conviction. *McDuff*, 939 S.W.2d at 614; *Fisher*, 851 S.W.2d at 303 ("[P]roduction and identification of the victim's body or remains is not part of the corpus delicti of murder.").

Under the corpus delicti rule, we consider all the record evidence, other than appellant's extrajudicial confessions, in the light most favorable to the jury's verdict to determine whether that evidence tended to establish that Kendrick was actually murdered by someone. *See Fisher*, 851 S.W.2d at 303; *see also McDuff*, 939 S.W.2d at 614 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## 2. The evidence is legally sufficient to support the corpus delicti of felony murder.

In this case, there were several pieces of evidence that make it more probable than not that Kendrick died as a result of felony murder. Kendrick was a three-year-old boy in the sole care of appellant when the child suddenly and completely vanished. According to appellant, Kendrick opened the front door of the apartment, walked outside on his own, and disappeared from a gated complex in the span of about five minutes. Appellant's neighbor and an apartment maintenance man did not see Kendrick outside or appellant's door ajar, nor did they observe appellant looking or calling for Kendrick. Police who responded to appellant's call that Kendrick was missing also observed that appellant did not look for Kendrick and appeared unconcerned about the child's disappearance.

Appellant's statements regarding his actions and whereabouts on the morning that Kendrick disappeared were inconsistent, and both of his versions of events contrasted sharply with his own cell phone records. First, appellant claimed that he and Kendrick were at the apartment asleep until about 9:00 a.m.; however, appellant's cell phone records place him on the highway traveling to and from Baytown from about 4:00 a.m. to 5:00 a.m. Appellant also claimed to have looked for Kendrick for an hour before calling police—but neither his neighbor nor the maintenance man saw or heard appellant, and appellant's cell phone records placed him away from his apartment during that time frame. Further, after appellant admitted that he had been with two women that morning, appellant asked both of them to lie about Kendrick being with appellant when he visited their apartments on the morning that Kendrick disappeared.

Appellant hit or otherwise abused Kendrick on several occasions in front of various individuals, including Kendrick's mother and appellant's friend Patrick.

14

These abusive episodes followed a general pattern in which Kendrick would be crying or had an accident where he wet or soiled himself, and appellant would become angry, yell at Kendrick to hush or shut up, and would attempt to stop the crying and punish the behavior by shaking, punching, and hitting Kendrick, and once even holding Kendrick underwater. These incidents caused physical injuries, such as severe bruises, to Kendrick.

Likewise, in the days just prior to Kendrick's disappearance, Kendrick sustained injuries to his face, including a knot on his forehead and a "busted lip," while in appellant's care. The Wednesday before Kendrick disappeared, appellant told Gordon that he put a hole in her bathroom wall sheetrock when he hit Kendrick for wetting himself. Both Jackson and Smith saw Kendrick's facial injuries; appellant told Smith he had "whooped" Kendrick for urinating in his pants, while appellant told Jackson that Kendrick fell down the stairs. Gordon and Patrick described the hole in Gordon's bathroom wall as consistent with the approximate size and height of Kendrick's head. The Thursday before Kendrick disappeared, appellant became angry when Kendrick soiled himself and repeatedly hit Kendrick until Patrick's cousin pushed appellant aside to stop him from hitting Kendrick.

On that Thursday night before Kendrick disappeared, Patrick heard Kendrick start crying when appellant entered the bedroom where Kendrick was staying. Patrick heard appellant hitting Kendrick, telling him to stop crying and shut his mouth, and Kendrick continue to cry. Kendrick's crying abruptly stopped. No one saw Kendrick again after that night. Despite an extensive search involving police, civilian volunteers, bloodhounds, helicopters, and a flat-bottom boat, Kendrick was never found.

Appellant contends that the evidence of abuse was "somewhat suspect"

15

because it came from women who continued to have sex with appellant and allowed him unsupervised access to their children. Appellant also argues that, prior to Kendrick's disappearance, no witness intervened or reported the alleged abuse. However, according to Jackson, she confronted appellant about stopping his violent behavior toward Kendrick, and appellant agreed to stop. Jackson also offered the explanation that she did not report appellant because she wanted Kendrick to have a relationship with his father. Moreover, even Patrick, appellant's good friend, described appellant's abusive behavior toward Kendrick the day and night before Kendrick disappeared. Considering this evidence in the light most favorable to the verdict, it demonstrates appellant's history of becoming angry and physically violent toward Kendrick whenever he would cry, or wet or soil his pants. *See Fisher*, 851 S.W.2d at 304 (considering complainant's "strained relationship with appellant" prior to her disappearance in concluding that State's evidence satisfied corpus delicti of murder); *Smith v. State*, 968 S.W.2d 452, 462 (Tex. App.—Amarillo 1998), *vacated & remanded on other grounds*, 5 S.W.3d 673, 679 (Tex. Crim. App. 1999) (considering appellant's "well established history" of violently assaulting complainant in concluding that State's evidence satisfied corpus delicti of murder).

Appellant next argues that appellant's "whooping" Kendrick the night before he disappeared did not have the appearance of a criminal act because the bedroom was located near the living room, appellant left the door open when he exited the room, and appellant left the complainant at home with his wife and children while he drove his friends back to Gordon's apartment. The State, however, presented evidence that Patrick saw appellant enter Kendrick's room, heard Kendrick start to cry, heard appellant hitting Kendrick and telling him to shut up as Kendrick continued crying, and then did not hear Kendrick crying anymore. Patrick

16

"couldn't help but hear," and it was "obvious" that appellant was hitting Kendrick. The evidence also indicates that appellant knew that his wife and their two children were already upstairs asleep; his wife went to work early and needed to get the children ready to take them to daycare. Further, instead of driving over 30 minutes to take Patrick and Dwight back to Patrick's house, his usual practice, appellant drove them back to Gordon's apartment five minutes away so they could drive themselves back in appellant's truck. Patrick was very surprised that appellant let them use his truck. Appellant's behavior indicates that he did not want to be away from his apartment for very long. Appellant further emphasizes the lack of forensic evidence of any act of violence. However, the State need not present forensic evidence to satisfy the corpus delicti rule. *See Smith*, 968 S.W.2d at 457, 462 (concluding that corpus delicti of murder was met where no body or physical evidence of crime was discovered).

Appellant insists that while he did not initially provide his correct whereabouts on the morning Kendrick disappeared, he immediately corrected his version of events when police confronted him with cell phone records. However, even appellant's amended version of events failed to coincide with his actual travels and whereabouts that morning. Appellant further argues that his failed attempts to convince Gordon and Smith to lie that Kendrick had been with appellant that morning are merely suspicious and do not tend to prove murder; appellant merely feared that he would be held responsible for Kendrick's disappearance because he had left Kendrick unattended for several hours while he visited his girlfriends. Yet, despite this alleged fear, the evidence shows that appellant did not express any concerns about Kendrick's disappearance and did not even attempt to look for him. *See Trejos v. State*, 243 S.W.3d 30, 56–57 (Tex. Crim. App. 2007) (considering appellant's failure to "assist in searching for

17

[complainant] after she disappeared" in concluding that State's evidence satisfied corpus delicti of murder).

Here, the evidence demonstrates consistent, abusive behavior toward Kendrick by appellant that resulted in injuries. Three-year-old Kendrick was in appellant's care the night before and the day he suddenly vanished, appellant was the last-known person to see Kendrick alive, appellant's last-known interaction with Kendrick involved him hitting him in anger, and Kendrick was never seen again after he stopped crying that night. Appellant told conflicting stories, ultimately contradicted by cell phone records and witness testimony, when questioned about Kendrick's disappearance and about appellant's whereabouts just prior to Kendrick's disappearance. Finally, appellant was not concerned about Kendrick's disappearance and did not look for Kendrick.

Considering all this evidence in the light most favorable to the verdict, it tends to render it more probable than not that Kendrick died and that his death was caused by the criminal act of another. Reasonable individuals could conclude that this evidence tended to prove Kendrick was killed by criminal means. *See Fisher*, 851 S.W.2d at 304. Therefore, we overrule appellant's first issue.

## B. Appellant's legal insufficiency issues

In two related issues, appellant argues that the evidence is legally insufficient to support his conviction for felony murder. Specifically, appellant contends that (1) the evidence is insufficient to prove that appellant's striking the complainant was an act clearly dangerous to human life, particularly in the absence of expert testimony; and (2) the evidence is insufficient to prove that striking the complainant was a but-for cause of the complainant's death. We conclude that the evidence is legally sufficient as to both issues.

18

### 1. Applicable law and standard of review

Appellant was charged with committing the felony offense of injury to a child by striking the complainant with his hand, and while in the course of the commission of injury to a child, committing an act clearly dangerous to human life, namely, striking the complainant with his hand, thereby causing the death of Kendrick Jackson. A separate paragraph alleged alternatively that appellant committed felony murder and caused the death of the complainant by striking the complainant with an unknown object. The jury charge tracked the indictment.

A person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2012). Here, the underlying felony offense is injury to a child. A person commits the felony offense of injury to a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes" bodily injury or serious bodily injury to a child. *Id.* § 22.04.

In evaluating the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). This standard applies equally to circumstantial and direct evidence. *Laster*, 275 S.W.3d at 517–18. Because the factfinder views the evidence first-hand, the factfinder is in the best position to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the evidence. *See Jackson*, 443 U.S. at 319; *Laster*, 275 S.W.3d at 517 ("[U]nlike the

19

factfinder—who can observe facial expressions and hear voice inflections first-hand—an appellate court is limited to the cold record."). We presume that the factfinder resolved any conflicts in favor of the verdict and must defer to that resolution, as long as it is rational. *Jackson*, 443 U.S. at 326. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster*, 275 S.W.3d at 517.

Circumstantial evidence alone is sufficient to establish guilt, and is as probative as direct evidence in establishing the guilt of the defendant. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). The standard of appellate review for legal sufficiency is the same for both circumstantial and direct evidence cases. *Id.* Unlike in the corpus delicti analysis, we consider appellant's extrajudicial confession as part of the evidence. *See Herrero*, 124 S.W.3d at 833 (citing *Emery v. State*, 881 S.W.2d 702, 706 (Tex. Crim. App. 1994)).

### 2. The evidence is legally sufficient to support that appellant's striking Kendrick was an act clearly dangerous to human life.

Expert opinion testimony is not necessarily required to prove cause of death, and cause of death may be proven solely by circumstantial evidence. *See Boone v. State*, 689 S.W.2d 467, 468 (Tex. Crim. App. 1985) (citing 29 Tex. Jur. 2d, *Homicide*, § 180, p. 282); *Hines v. State*, 515 S.W.2d 670, 673 (Tex. Crim. App. 1974) (same); *Williams v. State*, 464 S.W.2d 114, 115 (Tex. Crim. App. 1971) (explaining that "no expert opinion evidence was introduced but cause of death may be shown by other means," such as defendant's admission that he shot complainant).

Here, the State presented evidence of two separate extrajudicial confessions by appellant. After having been arrested for providing a false statement in

20

connection with the investigation of his missing son, appellant told Johnson that police were not going to find the child, that appellant was tired of the child peeing on himself, that appellant hit the child, and that the child got what he deserved. Johnson later realized that appellant had been talking about Kendrick. When discussing his missing son while in federal prison, appellant told Fusilier that his son's body would not be found. Appellant told Fusilier that he lost his temper because "[t]he child shit on himself"; he struck Kendrick on the cheek, which left a "dent" in his cheek; and after appellant hit Kendrick, the child was not moving. Appellant indicated the incident happened at his home on a Thursday night. Appellant also told Fusilier that he panicked and put the child in the bathtub, and later wrapped him in garbage bags and put him in the trunk of appellant's car. Then appellant headed toward his hometown, New Orleans, and disposed of his son's body near a boat ramp east of Houston.

Appellant's confessions were corroborated by the testimony of Patrick and by the cell phone records. Patrick was at appellant's apartment the Thursday night before appellant reported Kendrick missing on Friday. Although Patrick did not visually witness appellant striking Kendrick, Patrick heard Kendrick crying and heard an angry appellant hitting Kendrick until the crying stopped. No one ever saw Kendrick after that night. Appellant's cell phone records indicate that appellant drove to the east side of Houston near Baytown, and several bodies of water, in the early morning hours after Patrick heard him hitting Kendrick, before appellant reported Kendrick as missing. The details in appellant's confessions regarding how he struck Kendrick until the child was not moving on a Thursday night at appellant's home and how appellant disposed of Kendrick's body at a boat ramp east of Houston thus "were consistent with evidence from other sources." *See Herrero*, 124 S.W.3d at 833. Moreover, several witnesses corroborated the

detail that appellant reacted angrily and violently to Kendrick's crying, or wetting or soiling himself by physically abusing the child, which provided a possible motive for that Thursday night's beating. As factfinder, the jury was free to choose to believe the State's witnesses. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

Nevertheless, appellant contends that his alleged confessions provide "very little detail," and without expert testimony, the jury could not determine beyond a reasonable doubt that appellant's blow to the complainant's cheek, even one resulting in a "dent," was capable of causing the child's death. Appellant argues that the State could have presented expert evidence, even in the absence of a body. Appellant also argues that, other than his alleged statement that the complainant was "not moving," there was no evidence that the injury caused by striking the complainant was an act clearly dangerous to human life that killed him.

We find no merit in appellant's position. The law permits the State to prove cause of death without expert testimony, and under these circumstances, the jury rationally could have determined that appellant's act in striking Kendrick was clearly dangerous to human life based on the evidence presented. Here, the evidence shows that Kendrick was a three-year-old boy who barely stood three feet tall. Appellant was a full-grown man shown to be capable of hitting Kendrick with sufficient force to damage sheetrock in a wall. Appellant's hitting Kendrick that Thursday night was loud enough to be heard over a basketball game airing on television, forceful enough to "dent" Kendrick's check; and after appellant stopped hitting Kendrick, Kendrick stopped crying and was not moving. Appellant then wrapped up Kendrick's body in garbage bags and drove to Baytown to dispose of it. In addition to the evidence of the circumstances of how appellant hit Kendrick and then disposed of the child's lifeless body, appellant repeatedly lied about his

actions and his whereabouts that morning. A defendant's conduct in making up false statements to cover up the commission of a crime indicates "consciousness of guilt" and is admissible to prove that he committed the offense. *Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Appellant also enlisted Gordon and Smith in his attempt to lie about Kendrick's whereabouts that morning. *See Guevara*, 152 S.W.3d at 50 ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."); *Huffman v. State*, 775 S.W.2d 653, 660 (Tex. App.—El Paso 1989, pet. ref'd) (explaining that "[e]vidence of subterfuge, if believed to be such by the jury, serves not only to negate attempted exculpatory hypotheses, but also by its inherent connection to motive and sense of guilt, may provide affirmative evidence of culpability").

Based on the record evidence, viewed in the light most favorable to the verdict, and deferring to the factfinder's resolution of any conflicts, a rational jury could have found that appellant struck Kendrick and, in doing so, committed an act clearly dangerous to human life. *See Jackson*, 443 U.S. at 319, 326. Therefore, we overrule appellant's second issue.

### 3. The evidence is legally sufficient to support that appellant's striking Kendrick caused the child's death.

The existence or nonexistence of a causal connection is a question for the jury's determination. *See Dorsche v. State*, 514 S.W.2d 755, 757 (Tex. Crim. App. 1974); *Hale v. State*, 194 S.W.3d 39, 42 (Tex. App.—Texarkana 2006, no pet.). "The State is not required to prove beyond a reasonable doubt that the act alleged in the indictment *alone* caused the death." *More v. State*, 692 S.W.2d 912, 920 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd) (citing *Jones v. State*, 644 S.W.2d 530, 532 (Tex. App.—Corpus Christi, 1982, no pet.)). It is an established

rule in homicides that if the act of the defendant alleged in the indictment contributed to the death of the deceased, he is responsible, though other contributing causes existed. *Id.* (citing *Jones*, 644 S.W.2d at 531–32, and *Wright v. State*, 388 S.W.2d 703, 706 (Tex. Crim. App. 1965)). In the section "Causation: Conduct and Results," the Texas Penal Code provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX. PENAL CODE ANN. § 6.04(a) (West 2012); *Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).[2] "If concurrent causes are present, two possible conditions exist to satisfy the 'but for' requirement: (1) the defendant's conduct may be sufficient by itself to have caused the harm, regardless of the existence of a concurrent cause; or (2) the defendant's conduct and the other cause *together* may be sufficient to have caused the harm." *Robbins*, 717 S.W.2d at 351. A defendant cannot be convicted if the additional cause, other than the defendant's conduct, is clearly sufficient, by itself, to produce the result *and* the defendant's conduct, by itself, is clearly insufficient. *Id.*

Here, as detailed above, the State presented evidence that on the night of

---

[2] Appellant, however, does not argue that the trial court erred in failing to charge the jury on concurrent causation. The record does not reflect any request by appellant that the trial court include a section 6.04(a) instruction, and this issue was not otherwise presented to the jury in the charge. *Cf. Robbins*, 717 S.W.2d at 351 (concluding concurrent causation issue was before jury where trial court included "contributed to cause" language in charge). It was appellant's burden to raise this defensive theory and request a concurrent-causation instruction. *See Remsburg v. State*, 219 S.W.3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd); *Hutcheson v. State*, 899 S.W.2d 39, 42–43 (Tex. App.—Amarillo 1995, pet. ref'd). Further, appellant is not entitled to an instruction not raised by the evidence. *See Remsburg*, 219 S.W.3d at 545; *Hutcheson*, 899 S.W.2d at 42. Here, no evidence suggests that any other possible concurrent cause was "clearly sufficient" by itself to result in Kendrick's death or that appellant's striking Kendrick was "clearly insufficient" by itself to produce the ultimate result. Without evidence of both, the trial court was not required to provide a concurrent-causation instruction. *See* TEX. PEN. CODE ANN. § 6.04(a); *Remsburg*, 219 S.W.3d at 545; *Hutcheson*, 899 S.W.2d at 42.

April 6, appellant lost his temper with three-year-old Kendrick, who had again soiled himself, and then struck him such that the blow left a "dent" in Kendrick's cheek. It was "obvious" to Patrick from what he heard that appellant was hitting Kendrick. After this particular "whooping" session, Kendrick stopped crying and stopped moving. Appellant panicked, wrapped up Kendrick's "not moving" body, placed it in the trunk of appellant's car, and drove out to Baytown, where appellant disposed of Kendrick's body near a boat ramp. Appellant then provided inconsistent statements, ultimately shown to be false, and asked his girlfriends to lie that Kendrick had been with appellant on the morning of April 7.

Appellant argues that the evidence "did not prove, beyond a reasonable doubt, a but-for causal connection between the charged cause of death, striking the complainant, and the complainant's death." Appellant argues the child still could have been alive after the blow, and that he could have died from the failure to obtain medical care, asphyxiation, or even drowning. Appellant cites various cases in support of his assertion that the State's causation evidence is insufficient in the absence of expert testimony. However, unlike the circumstances arguably presented in those cases,[3] there is no evidence of any possible concurrent cause

---

[3] In *Umoja v. State*, the appellant argued that the evidence showed his individual blows to the complainant, where the complainant was beaten by three men, caused only superficial wounds or occurred after the complainant was already dead. However, the medical examiner testified that each of the blows, including the appellant's, was a contributing factor to the complainant's death, and the court thus concluded that "no other concurrent cause was 'clearly sufficient' to cause the victim's death." 965 S.W.2d 3, 6–9 (Tex. App.—Fort Worth 1997, no pet.). In *Arnold v. State*, the appellant argued the complainant's death could have been prevented by medical treatment based on expert testimony that his gunshot wounds would not have killed the complainant instantly. However, this court concluded that "theoretical rescue does not break the causal chain leading from the appellant's acts to [the complainant's] death." 686 S.W.2d 291, 294 (Tex. App.—Houston [14th Dist.] 1985, *aff'd*, 742 S.W.2d 10 (Tex. Crim. App. 1987). In *Rojas v. State*, the appellant argued that the expert's testimony presented a different cause of death (asphyxiation) than that named in the indictment (shooting with firearm). However, the medical examiner testified that the official cause of death was the complainant's gunshot wound, and the gunshot wound was an equally important cause of the death even if asphyxiation had

"clearly sufficient" by itself to have resulted in Kendrick's death. *See Robbins*, 717 S.W.2d at 351. Nor was there any evidence that appellant's conduct in striking Kendrick was "clearly insufficient" by itself to cause Kendrick's death. *See id.* The jury, as sole factfinder, was free to believe, and draw reasonable inferences from, the evidence—that Kendrick was alive when appellant entered the bedroom on April 6; that Kendrick stopped moving after appellant struck him in the cheek and "dented" him; that, in a panic, appellant then disposed of Kendrick's body; and that appellant lied about his and Kendrick's whereabouts the morning of April 7—and thus conclude appellant killed Kendrick by striking him. *See Jackson*, 443 U.S. at 319; *Sharp*, 707 S.W.2d at 614.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that appellant's conduct in striking Kendrick alone caused his death. *See Jackson*, 443 U.S. at 319; *see also* TEX. PENAL CODE ANN. § 6.04(a). Further, viewing the evidence in the light most favorable to the verdict, even assuming, *arguendo*, that there was some other possible source of injury "clearly sufficient" by itself to cause Kendrick's death, appellant's striking Kendrick was not "clearly insufficient" by itself so as to absolve appellant of criminal responsibility under section 6.04(a). *See Thompson v. State*, 93 S.W.3d 16, 21 (Tex. Crim. App. 2001); *see also* TEX. PENAL CODE ANN. § 6.04(a). Thus, the evidence meets section 6.04 and is legally sufficient—a rational jury could have found, beyond a reasonable doubt, that appellant's striking Kendrick was a

been the immediate catalyst. The Court of Criminal Appeals thus concluded a rational jury could have found that the gunshot wound ultimately caused the complainant's death, whether she died before or after the plastic bag was placed on her head. 986 S.W.2d 241, 246–47 (Tex. Crim. App. 1998) (upholding capital murder conviction); *see Jones v. State*, 740 S.W.2d 497, 498–99 (Tex. App.—Dallas 1987, pet. ref'd) (upholding murder conviction and concluding, even excluding expert testimony, there was sufficient evidence to prove appellant's striking complainant with fireplace poker caused her death even though "[a]s a direct consequence, she died of asphyxiation" when her unconscious body fell into position where she could not breathe).

but-for cause of the child's death.  Therefore, we overrule appellant's third issue.

### III.     CONCLUSION

Having overruled all of appellant's legal insufficiency issues, we affirm the judgment of the trial court.


/s/     Tracy Christopher
Justice


Panel consists of Justices Frost, Christopher, and Jamison.

Publish — TEX. R. APP. P. 47.2(b).