In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-18-00218-CR**
**NO. 09-18-00219-CR**
_____

**BRADLEY JACOBS SHUMWAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 17-10-12127-CR & 17-12-15229-CR**

**MEMORANDUM OPINION**

A jury found Bradley Jacobs Shumway guilty of indecency with a child in trial cause number 17-10-12127-CR and guilty of indecency with a child in trial cause number 17-12-15229-CR. Shumway elected for the trial court to assess punishment. In each case, the trial court sentenced Shumway to twenty years of confinement with a $5,000 fine and ordered the sentences to run consecutively. In

one appellate issue in each case, Shumway argues that there was insufficient

evidence of the *corpus delicti* of indecency with a child. We affirm.

Indictments

In cause number 17-10-12127-CR, a grand jury indictment alleged that

Shumway

> on or about August 4, 2016, and before the presentment of this
> indictment, . . . did then and there intentionally or knowingly cause the
> defendant's sexual organ to contact or penetrate the sexual organ of
> K.J.,[1] a child who was then and there younger than 6 years of age[.]

*See* Tex. Penal Code Ann. § 22.021(a)(1)(B). In cause number 17-12-15229-CR, a

grand jury indictment alleged that Shumway

> on or about August 04, 2016, and before the presentment of this
> indictment, . . . did then and there, with intent to arouse and gratify the
> sexual desire of the defendant, engage in sexual contact by touching the
> genitals of K.J., a child younger than 17 years of age, with the
> defendant's hand or finger[.]

*See* Tex. Penal Code Ann. § 21.11(a)(1).

Background

Sergeant Jody Armstrong, an investigator with the Montgomery County

Sheriff's Office, testified that she first became involved in this case upon receiving

---

[1] We refer to the victim, family members, and certain other individuals with initials. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

information from CPS on September 29, 2016 of an assault. According to Sergeant Armstrong, CPS reported that Shumway allegedly sexually assaulted K.J., a child "[j]ust under 18 months [old,]" in Montgomery County.

Sergeant Armstrong testified that she went to K.J.'s home to meet with the victim's family and collect information. According to Armstrong, K.J.'s parents told her they knew Shumway and they identified Shumway as the perpetrator from a photograph Sergeant Armstrong showed them. At trial, Sergeant Armstrong identified the defendant as the man in the photograph that K.J.'s parents identified as Shumway. Sergeant Armstrong testified that as part of her investigation, she obtained statements from K.J.'s parents and Bishop Thad Jenks. Sergeant Armstrong attempted to talk to Shumway's wife but was unable to obtain a statement from her. Sergeant Armstrong explained that there was no forensic interview done on K.J. because, due to her age, she was non-verbal and did not meet the age requirement for the Safe Harbor interview, which is typically three years old or older. Sergeant Armstrong testified that she collected the SANE (Sexual Assault Nurse Examiner) exam reports for K.J. and her three-year-old brother, T.J., that both children had been at Shumway's house on the date of the alleged offenses, and that Armstrong was able to confirm that Shumway had access to K.J. during the time period when the alleged offenses took place. According to Sergeant Armstrong, when she scheduled

K.J.'s SANE exam she did not expect the exam would show an injury because of "[t]he time that had passed." As part of her investigation, Sergeant Armstrong also obtained records from the pediatrician K.J. saw after the alleged offenses but prior to the SANE exam. Sergeant Armstrong testified that after reviewing the case with the District Attorney's office, she completed a probable cause statement and filed for a warrant for Shumway for aggravated sexual assault of a child.

Thad Jenks, an attorney and a volunteer bishop, testified that as a volunteer bishop he is "responsible for the spiritual and temporal welfare of the members of [his] congregation[]" in the church in his ward or geographic area and "help[s] those who confess and are wanting spiritual advice to go through the repentance process . . . and obtain forgiveness and become better people." Jenks testified that in September 2016 Shumway "made it clear to [Jenks] that [Shumway] needed to make a confession[.]"According to Jenks, Shumway met with Jenks in his office at the church and told Jenks that he had improper contact with a child that Jenks believed to be a little bit more than a year old:

> He told me that he and his wife were watching some -- the children of some family friends, that they were there for the weekend. While they were there he took the young daughter into his bedroom and moved aside her -- pulled down a little bit her diaper and touched her in her genital region with his hands, with his tongue, and with his penis.

4

Jenks testified that the child's parents had gone to church in his ward and that he and the parents "were friends and fellow members of the ward." Jenks testified that this information fell into a category that kept Jenks from "keeping things confidential." According to Jenks, a detective contacted him and he provided the information that he was required to disclose in a statement to the detective. Jenks met with K.J.'s parents and told them about what Shumway reported to him and that Shumway told him he contacted the child's skin. At trial, Jenks denied telling the parents that Shumway told him the contact was over the child's diaper and not contact with the child's skin.

C.S., Shumway's wife, testified that she had been married to Shumway for twenty-four years and had filed for divorce. She testified that she and Shumway were friends with K.J.'s parents, that she had babysat their son "many times[,]" and she had babysat K.J. "just a couple of times." According to C.S., the last time she watched T.J. and K.J. overnight was in early August 2016, when the children's parents went out of town. C.S. testified that she recalled that during that weekend K.J. walked around in a diaper, and C.S. did not put K.J.'s shorts on because "the shorts were very tight and too small and constrictive." C.S. testified that after that weekend, Shumway "was fasting a lot and somewhat withdrawn; but sometimes this had occurred before, but it seemed a little more than usual." C.S. also testified that

5

she remembers Shumway leaving to meet with the bishop prior to Shumway telling her what he did to K.J.

C.S. testified that around the end of September 2016, Shumway told C.S. that he had talked to the bishop and that Shumway needed to talk to her about something that had happened while they were watching K.J. and T.J. According to C.S., Shumway told her that while she was on the back patio talking to the Shumways' daughter, he placed K.J. on their bed and touched K.J.'s genitals with his hand, his mouth, and his penis.

C.S. testified that she clearly recalled sitting on the patio with her daughter for more than a fifteen-to-twenty-minute time period that weekend and that Shumway and K.J. were inside. C.S. testified that Shumway told her that he had touched K.J. because he "was curious whether it would give him an erection or not." C.S. testified that when he went into detail about his contact with K.J.'s vagina with his hand, "[h]e described it like he was reaching underneath and using one of his fingers there, and he couldn't recall whether -- how far it went in. And then that's when he stopped." According to C.S., Shumway told her two different versions of why his contact with K.J. stopped. One version was that he was interrupted by the foul smell of K.J.'s diaper, and the other one was that he realized he was "doing something very wrong, and he kind of woke up to the reality that it could get him in a lot of

6

trouble[.]" C.S. testified that later Shumway told her that he "felt sexually neglected and also emotionally neglected" and that these feelings along with strange thoughts and temptations led up to what he did to K.J. According to C.S., Shumway also told her that he had unwanted thoughts that weekend and that C.S. was "irresponsible to not put the shorts back on [K.J.] after changing her diaper."

Jamie Ferrell, clinical director of forensic nursing services for the Memorial Hermann Healthcare System, testified that she treated K.J. at Children's Safe Harbor. According to her records admitted at trial, K.J.'s mother, L.J., consented for Ferrell to treat K.J. on October 6, 2016. Ferrell testified that because K.J. was pre-verbal, Ferrell asked L.J. the reason for the visit. Referring to her records, Ferrell testified that L.J. reported the following:

> We left our kids with friends that we have known for three to four years from church. Then Brother Shumway, he told his Bishop what he had done, and then we were told. Brother Shumway said he was going to change [K.J.]'s diaper and he touched her over the diaper with his tongue and hands and penis, but it was done all over the diaper.

Ferrell testified that no evidence was collected because the alleged offenses would have occurred greater than ninety-six hours before K.J. arrived for the exam and "evidence collection and the swabbing on a patient is only done within 96 hours." According to Ferrell, her examination noted that there were no body surface injuries to K.J. In examining K.J.'s genitalia and anus, Ferrell also noted no evidence of

7

injury. Ferrell testified that based on the history provided by the parent, she would not anticipate having found any injury to K.J. because "touching to the area, rubbing to the area, that's not any different than really if you're cleaning your child in this area[,]" and even if there had been penetrating trauma, she would not expect there to be injury because that part of the body "heals very, very fast." According to Ferrell, after that length of time it is "incredibly rare[]" to find any injury in that area when doing these exams on children.

L.J., K.J.'s mother, testified that she has known C.S. and Shumway for five years and that they were friends and attend the same church. L.J. explained that prior to her placing T.J. in daycare, C.S. often watched T.J. while L.J. worked and L.J.'s husband traveled. L.J. testified that the Shumways watched T.J. and K.J. at the Shumways' house while L.J. and her husband went on an anniversary trip August 4 through 6, 2016. According to L.J., in September 2016 she and her husband were called to a meeting in their bishop's office and Bishop Thad Jenks and Bishop Kirkin talked to them. L.J. testified that when they called the meeting, she and her husband did not have any indication regarding the purpose of the meeting. L.J. testified that, after she learned in September 2016 what happened between the defendant and K.J., she was "very surprised . . . overwhelmed[,] [and] felt like . . . a victim, also." L.J. explained that they booked an appointment two or three days after the meeting with

K.J.'s pediatrician for K.J. to be examined for injuries and sexually transmitted diseases. The pediatrician's records admitted at trial indicate that K.J. was seen on September 28, 2016, when she was eighteen months old, that the pediatrician found no physical injuries, and that the results from the STD testing were negative. L.J. testified that subsequently Jody Armstrong met with them to confirm Shumway's identity and asked that they take K.J. and T.J. for an exam at Children's Safe Harbor. L.J. recalled telling the SANE nurse that there was contact with K.J.'s vagina and it was skin-to-skin contact. According to L.J., they got their information about what happened to K.J. from Thad Jenks and not Shumway directly. L.J. testified at the time of the incident K.J. could only speak "20 or 30 words[,] . . . pointed a lot to what she needed[,]" and now at the age of three has never said anything about what happened to her.

At the close of the State's evidence, the defense moved for a directed verdict based on the *corpus delicti* doctrine. The trial court denied the motion and denied Shumway's request for an instruction in the jury charge on the *corpus delicti* doctrine. The defense called no witnesses and rested. In cause number 17-10-12127-CR, although the grand jury indicted Shumway for aggravated sexual assault of a child, the jury found Shumway guilty of the lesser-included offense of indecency with a child. In cause number 17-12-15229-CR, the jury found Shumway guilty of

indecency with a child. After a hearing on punishment,[2] in each case the trial court sentenced Shumway to twenty years of confinement with a $5,000 fine and ordered the sentences to run consecutively. Shumway timely appealed.

## Issue on Appeal

In his sole appellate issue in both appellate causes, Shumway argues that there is insufficient evidence of the *corpus delicti* of the crimes of indecency with a child because his extrajudicial confessions to his bishop and his wife are not legally sufficient evidence of guilt absent independent evidence that a crime was committed by someone. According to Shumway, his confessions were not corroborated by evidence that anyone touched K.J.'s genitals with their hand or genitals, there was

[2] The defendant elected to have the trial judge assess punishment. During the punishment hearing, C.S. testified that throughout their marriage the defendant made other confessions to her about other things he had done. C.S. recalled that many years ago when they lived in another state, the defendant had confessed to her about an incident with another infant that had occurred in 1994 or 1995. During that time, she was babysitting A.H., a child between the ages of eight months and fourteen months. C.S. testified that some months after she had cared for A.H. in their home, Shumway confessed to her that he had molested A.H. C.S. testified that on another occasion Shumway confessed to her that he entered a tenant's apartment with a key because he did general maintenance for the tenant, and without the tenant's permission he purposefully walked into the tenant's bathroom while the tenant was showering. C.S. testified that Shumway also had confessed to her that, while her sister was visiting, he looked underneath the door using a mirror to watch her sister get into the shower, and that Shumway confessed that he had placed a hole in the vent in front of the bathroom vanity in their trailer so that he could see up the vent with the intention of seeing their teenage daughter when she was getting ready to shower.

no outcry from the child or physical evidence of contact, and no one witnessed Shumway commit the offenses of indecency with a child.

<u>Standard of Review and Applicable Law</u>

We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under that standard, we view all the evidence in a light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318-19). The jury is the sole judge of the credibility and weight to be attached to the testimony of the witnesses. *Id.* In this role, the jury may choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Further, the jury is permitted to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Temple*, 390 S.W.3d at 360. When the record supports conflicting inferences, we presume that the jury resolved those conflicts in favor of the verdict and therefore defer to that determination. *Id.* Direct and circumstantial evidence are equally probative of an actor's guilt, and "'circumstantial evidence

11

alone can be sufficient to establish guilt.'" *Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

The "*corpus delicti* rule is a common law, judicially created, doctrine—the purpose of which was to ensure that a person would not be convicted based solely on his own false confession to a crime that never occurred." *Carrizales v. State*, 414 S.W.3d 737, 740 (Tex. Crim. App. 2013). Under the *corpus delicti* doctrine, a defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt absent independent evidence of the *corpus delicti*.[3] *Miller v. State*, 457 S.W.3d 919, 924 (Tex. Crim. App. 2015). The *corpus delicti* of any criminal offense is that the offense in question has been committed by someone. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993).

To satisfy this rule, there must be "evidence independent of a defendant's extrajudicial confession show[ing] that the 'essential nature' of the charged crime was committed by someone." *Hacker v. State*, 389 S.W.3d 860, 866 (Tex. Crim. App. 2013). The other evidence need not be sufficient by itself to prove the offense; rather, "'all that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence.'"

---

[3] "*Corpus delicti*" is Latin for "body of the crime[,]" and is defined as "[t]he fact of a transgression" or "the material substance on which a crime has been committed." *Corpus delicti*, Black's Law Dictionary (8th ed. 2004).

*Rocha v. State*, 16 S.W.3d 1, 4 (Tex. Crim. App. 2000) (quoting *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997)). The rule is satisfied "if some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred." *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002); *see also Turner v. State*, 877 S.W.2d 513, 515 (Tex. App.—Fort Worth 1994, no pet.) ("If there is some evidence corroborating the admission, the admission may be used to aid in the establishment of the corpus delicti."). The *corpus delicti* of indecency with a child is the occurrence of a sexual touching of the child with the intent to arouse or gratify the sexual desire of any person. *Gonzales v. State*, 4 S.W.3d 406, 412-13 (Tex. App.—Waco 1999, no pet.) (quoting Tex. Penal Code Ann. §§ 21.01(2), 21.11(a)(1)).

So long as there is independent evidence to render the *corpus delicti* of a crime "'more probable than it would be without the evidence,'" the essential purposes of the doctrine have been satisfied. *Julian v. State*, 492 S.W.3d 462, 468 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (quoting *Gribble v. State*, 808 S.W.2d 65, 71-72 (Tex. Crim. App. 1990) (plurality op.)); *see also Rocha*, 16 S.W.3d at 4. The quantum of evidence required is not great. *Gribble*, 808 S.W.2d at 71-72. We consider all the record evidence—other than appellant's extrajudicial confession—in the light most favorable to the jury's verdict to determine whether that evidence

tended to establish that an offense occurred. *Fountain v. State*, 401 S.W.3d 344, 353 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd) (citing *Fisher*, 851 S.W.2d at 303). The State may prove the *corpus delicti* by circumstantial evidence. *See id.*

Analysis

Viewing all the evidence in the record in a light most favorable to the jury's verdict, we conclude that "some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred." *Salazar*, 86 S.W.3d at 645. The evidence tended to establish that the offenses occurred. *See Fountain*, 401 S.W.3d at 353 (citing *Fisher*, 851 S.W.2d at 302-03).

The jury heard testimony from C.S. and the bishop, as well as the parent of the victim, that was independent from Shumway's extrajudicial confessions that render the commission of the offense more probable than without such evidence. *See Rocha*, 16 S.W.3d at 4; *see also Salazar*, 86 S.W.3d at 645.

C.S.'s testimony that she and Shumway had watched their friends' children, K.J. and T.J., while the friends were on a weekend anniversary trip in August 2016, that during that weekend she left K.J.'s shorts off and allowed K.J. to run around the house in her diaper because the shorts were too small, that C.S. recalled being on the patio with her daughter that weekend while Shumway was with K.J. inside the house,

14

that after that weekend Shumway fasted a lot and was somewhat withdrawn, and that she remembered Shumway going to speak with the bishop in September 2016, would tend to corroborate Shumway's confessions and serve to make it more probable that the crimes occurred than without such evidence.

Additionally, Jenks testified that as a volunteer bishop he is "responsible for the spiritual and temporal welfare of the members of [his] congregation[]" in the church in his ward or geographic area and "help[s] those who confess and are wanting spiritual advice to go through the repentance process . . . and obtain forgiveness and become better people." And, he testified that Shumway contacted him in September 2016 to meet with him. Further, L.J., the mother of the victim testified that she left her two children with the Shumways in August 2016, that she was friends with the Shumways, that they attended the same church, and that she first learned of what had happened when their bishop told them what the defendant said happened. We find the evidence was legally sufficient, and we overrule Shumway's issue in each case and affirm the trial court's judgments.

AFFIRMED.

<br>

_____
LEANNE JOHNSON
Justice

15

Submitted on September 25, 2019
Opinion Delivered January 8, 2020
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.