

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00132-CR

_____

SHAQUITA GALLOWAY, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court No. 1472654D

Before Pittman, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Shaquita Galloway appeals from her conviction for the first-degree felony offense of knowingly causing serious bodily injury to a child. In two points, she argues that the evidence is insufficient to show that she knowingly committed the offense and that the judgment sets forth the incorrect culpable mental state for which she was convicted. Because we hold that sufficient evidence supports the conviction but agree that the judgment sets forth the incorrect culpable mental state, we affirm the judgment as modified.

### II. BACKGROUND

On April 16, 2013, Galloway went to the bathroom of a home in which she was living because she stated that "she thought she was on her period" and "she just wasn't feeling good." Seven other people were present at the home. She was in the bathroom for two to five hours, during which time at least one of the people in the house checked on her every thirty to forty-five minutes. When she came out of the bathroom, she was a "little weak" and had trouble standing and walking. The decision was made to take her to the hospital.

At the hospital, according to Dr. Erin Susan Huntley (formerly Losey), Galloway's main complaint was vaginal bleeding. After performing an exam of Galloway under sedation, Huntley diagnosed Galloway with "vaginal lacerations and in her cervix, both [of] which were consistent with a very recent delivery, vaginal

2

delivery[.]" After the vaginal lacerations were repaired, Huntley told Galloway her findings, concerns, and suspicions. Galloway then stated that she had delivered a baby, and the baby was still in her home.

On April 17, 2013, Officer Mussato[1] with the Fort Worth Police Department was dispatched to the hospital. He spoke with Galloway at the hospital and asked her about a baby. However, Galloway stated that she had not delivered a baby. After speaking to others at the hospital, including the doctor who said that Galloway had given birth, Mussato went to the house where Galloway lived and found a deceased newborn baby boy under the bathroom cabinet.

Over the course of the investigation, Galloway was interviewed multiple times by various individuals. According to Denise LaJeunesse, an investigator with Child Protective Services, Galloway's testimony changed over the course of the interviews. With regard to whether or not the baby ever cried, LaJeunesse testified:

> I know [her testimony] changed from initially where she said the baby had not cried, and then here when I interviewed her, she was saying that the baby was in the toilet for about five minutes, [the] baby cried while the baby was in the toilet. She then said she didn't recall [whether] the baby [had] cried after she [had taken] him out of the toilet.
>
> . . . .
>
> Here she thinks she didn't hear the baby cry again, and then a little bit later in the interview, she said she heard the baby cry while she was in the shower . . . . I don't think she said the baby cried for five

---

[1]The record does not reflect a first name for Officer Mussato.

minutes. I think she said the baby was in the toilet for five minutes, but she did say the baby [had] cried while in the toilet.

And, according to LaJeunesse, after Galloway removed the baby from the toilet and she got in the shower, Galloway said that she had heard the baby cry again.

With regard to where the baby was while Galloway showered, LaJeunesse testified, "She told me that she [had] laid the baby onto the floor without anything under the baby" and that she did not put anything over the baby while he was on the floor.[2] Huntley also stated that "[p]er the patient, the baby was not covered." LaJeunesse testified further, "It sounded like, after she got out of the shower, she -- blacked out. When she woke from blacking out, she began to clean up the blood. When she was finished with that, she put the baby and the placenta under the bathroom sink and covered them with a towel."

Galloway stated that when the baby was born, she was scared and did not know what to do. At one interview, Galloway stated that at the time of the birth, she was unaware that she was pregnant. Later during the same interview, she stated that she had "suspicions" that she might be pregnant for approximately one month prior to the birth.

At the police interview on April 22, 2013, at Alliance for Children, Galloway stated that the baby cried for three to five minutes. Later in the interview, she stated

---

[2]However, at the police interview on October 4, 2016, Galloway stated that she had dried the baby off and had set him on the floor on a towel.

that, while she was taking a bath, she heard the baby cry for "like a minute," then she "reached over and tried to bring him back . . . alive [be]cause he had stopped breathing." When he stopped breathing, she was "hitting him on his back trying to revive him but [then] nothing." Despite her nine months of medical-assistant training, which included "respiratory" and "vitals," she did not know why she did not call 911.

During the police interview on October 4, 2016, Galloway stated that, while she was in the shower, the baby "gave one cry and that was it." She also stated that the baby's one cry was uttered when he was out of the water—after she had washed him and was holding him in her arms. She stated that she performed no medical care and that it did not cross her mind to call 911.

The autopsy indicated that the baby was born alive and was a viable infant. He was full term and healthy, with no birth defects and no abnormalities. The cause of death was "unknown" or "undetermined."

Galloway was indicted for the first-degree felony offense of knowingly causing serious bodily injury to a child by omission. At her jury trial, Galloway was found guilty and assessed a sentence of sixty-six months' confinement. While the indictment and Court's Charge stated that Galloway's actions were committed "knowingly," the Judgment of Conviction provides that Galloway was convicted for both intentional and knowing conduct.

## III. DISCUSSION

### A.      Point No. 1 – Sufficiency of the Evidence

In her first point, Galloway argues that there is insufficient evidence that her failure to seek medical care for the baby knowingly caused him any serious bodily injury by omission. She cites to Texas Penal Code Section 6.04(a), which states that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code Ann. § 6.04(a). Further, she contends that "but for" causation, as referred to in Section 6.04(a), must be established between an accused's conduct and the resulting harm. *See Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). Galloway argues that "[n]ot knowing the manner or cause of death, or even how long [the baby] lived, the State was consequently unable to show evidence of-much less prove beyond a reasonable doubt-how [Galloway's] failure to seek medical care caused [the baby] serious bodily injury."

### 1.      Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential

6

elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances

7

is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

### 2. The Offense of Injury to a Child Causing Serious Bodily Injury

With regard to the elements of the charged offense, a person commits the offense of injury to a child causing serious bodily injury if she "knowingly . . . by omission, causes to a child . . . serious bodily injury." Tex. Penal Code Ann. § 22.04(a)(1). "An omission that causes [serious bodily injury] is conduct constituting an offense under this section if: (1) the actor has a legal or statutory duty to act . . . ." *Id.* § 22.04(b). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id.* § 1.07(a)(8).

Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The State must prove that the defendant caused the result with the requisite intent; it is not enough to simply prove that the defendant engaged in the alleged conduct with the requisite criminal intent. *See Cook v. State*, 884 S.W.2d 485, 490 (Tex. Crim. App. 1994); *Lee v. State*, 21 S.W.3d 532, 540 (Tex. App.—Tyler 2000, pet. ref'd).

### 3.    Texas Cases

Galloway analogizes her case to other Texas cases involving charges of injury to a child by omission based upon a failure to provide medical care. *See Dusek v. State*, 978 S.W.2d 129 (Tex. App.—Austin 1998, pet. ref'd); *see also Payton v. State*, 106 S.W.3d 326 (Tex. App —Fort Worth 2003, pet. ref'd).

#### a.    *Dusek v. State*

In *Dusek*, the defendant was convicted of intentionally or knowingly causing serious bodily injury to a child by omission by, among other things, failing to provide prompt medical treatment for the child's broken leg. 978 S.W.2d at 133. The Austin court stated that it was not sufficient for the State to prove that the defendant had failed to provide medical care for a serious bodily injury. *Id.* Instead, it was necessary to prove that the child suffered serious bodily injury *because* the defendant had failed to provide medical care. *Id.*

In *Dusek*, there was no evidence that the mother had failed to obtain medical treatment for the child's broken leg; that any omission on her part aggravated the seriousness of the injury; that the leg had been broken for an unusual period of time; that treatment had been delayed; or that recovery was in any way hindered by a delay in receiving medical care. *Id.*; *Estrella v. State*, 546 S.W.3d 789, 801 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). Therefore, the court reversed the conviction for failure to obtain medical care for a child.

9

### b. *Payton v. State*

In *Payton*, the defendant was convicted of recklessly causing serious bodily injury to his eighteen-month-old grandson by failing to obtain reasonable medical care for him. 106 S.W.3d at 327–28. Citing *Dusek*, the court held that, under Section 22.04, it is not sufficient for the State to prove that the defendant failed to provide medical care for a serious bodily injury. *Id.* at 329. "Instead, it is necessary to prove that [the child] suffered serious bodily injury because [the defendant] failed to provide him medical care." *Id.*

However, after reviewing the record and applying the appropriate standard of review, this court held in *Payton* that the evidence was sufficient to support the jury's verdict that appellant had recklessly caused serious bodily injury by failing to obtain reasonable medical care for the child. *Id.* at 330.

> Based on the facts that appellant delayed seeking medical treatment for [the child] when the medical evidence showed that [the child] had visible signs of distress, appellant had emergency medical training, and [the doctor] stated that it was possible that [the child] would have survived if he had received medical care shortly after the injury occurred, the jury could have found that appellant acted recklessly and grossly deviated from the standard of care that an ordinary person would have exercised under all the circumstances as viewed from his standpoint.

*Id.*

### 4. Analysis

After reviewing the two cases Galloway contends are analogous to hers, we conclude that the nonbinding case is distinguishable and that the binding case

supports the holding here. In addition, while Galloway's brief focuses on the testimony of Greenburg, the Tarrant County Deputy Medical Examiner who participated in the autopsy and who testified that the baby's manner of death was "undetermined,"[3] it fails to address all of Greenburg's testimony and also that of Huntley, Galloway's treating physician at the hospital.

Here, unlike the facts in *Dusek*, there is evidence that Galloway delayed seeking medical care for the baby. Also, unlike *Dusek,* there is evidence that due to Galloway's failure to seek medical care, the baby was placed at a substantial risk of death.

Due to Galloway's delay in admitting that she had given birth, the baby was not discovered until the day after he was born. And, while Galloway emphasizes the testimony that the cause of death was "undetermined," the jury first heard testimony from Greenburg establishing the viability of the baby.

Q.     Was [the baby] born -- was he a viable infant?

A.     Yes.

Q.     What does that mean?

---

[3]Where the cause of death is undetermined, "[e]xpert opinion testimony is not necessarily required to prove cause of death, and cause of death may be proven solely by circumstantial evidence." *Fountain v. State*, 401 S.W.3d 344, 356–57 (Tex. App.— Houston [14th Dist.] 2013, pet. ref'd). "The State is not required to prove beyond a reasonable doubt that the act alleged in the indictment *alone* caused the death." *More v. State*, 692 S.W.2d 912, 920 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd) (citing *Jones v. State*, 644 S.W.2d 530, 532 (Tex. App.—Corpus Christi 1982, no pet.) (emphasis in original)).

11

A. Viable basically means that the infant would be of an age that would be able to survive.

. . . .

Q. Was [the baby] born alive?

A. Yes.

. . . .

Q. Was [the baby] born a healthy infant?

A. Yes.

Q. Was he born -- did it look to you like, from your training and experience, he was born at full term?

A. Yes.

Q. Did you find genital anomalies in looking at [the baby]?

A. Any congenital anomalies?

Q. Yes.

A. So those would be birth defects, and, no, we did not find any.

Q. What about any abnormalities?

A. No.

Q. What about any evidence of infection?

A. No.

As to the manner of death being undetermined, Greenburg testified that the Medical Examiner "didn't have a specific identifiable cause of death and, therefore,

12

[was] unable to make a determination about the manner of death." She summarized,

"So in this particular case, there was nothing specific that we could find, no congenital

anomalies, no infection, no evidence of injury that gave us a cause of death, and,

therefore, we couldn't determine the manner of death."

However, in responding to hypothetical questions,[4] Greenburg testified further:

Q.      [ ] If someone were to, say, have a baby, that drops them down into a toilet, do you think that would be a substantial risk of death for that child?

A.      Yes.

Q.      And why is that?

A.      A couple of different reasons.  And, obviously, if the child is left in the toilet, then there is a possibility of aspirating fluid and basically drowning in that fluid.  The water in the toilet would be contaminated and, therefore, be a potential risk for the development of an infection later on.

        . . . .

Q.      What about taking a newborn infant and placing it uncovered on the bathroom floor?  Would that be a substantial risk of death to that child?

A.      Yes.

---

[4]The use of hypothetical questions to establish that injuries could cause a substantial risk of death to a person have been held sufficient to support a conviction. *See Boney v. State*, 572 S.W.2d 529, 532 (Tex. Crim. App. 1978) (holding that evidence that victim sustained laceration, which doctor testified could cause shock that could result in death and could cause substantial risk of death, was sufficient to support finding of serious bodily injury within language of aggravated-assault statute).

Greenburg further testified that hypothermia is a diagnosis of exclusion and that "there's nothing definitive at autopsy to make that diagnosis." While Galloway argues that Greenburg's testimony is substantially identical to "there's no evidence to make that diagnosis [of hypothermia]," that summation ignores her other testimony.

In addition, Huntley, the obstetrician/gynecologist who treated Galloway at the hospital, testified to the importance of keeping a newborn baby warm and stimulated.

Q. So what's the most important thing whenever you have a newborn baby?

A. To ensure that they are staying warm and that they're stimulated.

Q. Why is it important to keep them warm?

A. Their body tissue ratio is very different than ours, so they dissipate very quickly, and babies can become hypothermic very quickly.

Q. What do you mean by massaging?

A. You stimulate them with your touch, and it stimulates respiratory action to breathe, and it also can generate heat.

. . . .

Q. Newborn infants feel pain?

A. Yes, sir.

Q. And if someone gets really cold, that can be painful, right?

A. Yes, sir.

Q. Would you say that delivering all the babies that you have, that there would be a substantial risk of death for having a baby that falls into the water of a toilet and leaving it there for five minutes?

14

A. Yes, sir.

Q. Why is that?

A. Because being wet, you lose heat very, very quickly, as well as a concern [they] could inhale fluid if they're in the water and they're not being stimulated.

Q. What about a baby that's alive and laying it on a floor without being covered?

A. Again, heat loss would be a primary concern.

Q. So laying a baby on the floor without being covered would be a substantial risk of death?

A. Yes, sir.

On cross-examination, Huntley added that the fact that the baby was laying in the toilet for five minutes exposed the baby to heat loss and not being stimulated.

In addition, similar to *Payton*, where the appellant had experience as an emergency medical technician, the jury here heard testimony that Galloway had attended Kaplan College, from which she had received a diploma as a medical assistant. The evidence indicated that Galloway was "certified BLS for health care providers, CPR, and AED." Also, her skills included "patient vitals, venipuncture, pharmacology, injections, urinalysis, specimen collection, various lab procedures, skilled use of [EKGs] and [AEDs], medical documentation, vision and hearing screening, HIPAA and OSHA regulations." While the jury also heard testimony that Galloway did not receive certification as a medical assistant, the jury was free to

consider that, despite her training and background, similar to *Payton*, Galloway provided no medical care to the newborn after giving birth.

### 5. Conclusion from the Evidence

After a thorough review of the record, and giving proper deference to the jury's verdict, we conclude that the evidence is sufficient to support Galloway's conviction. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Although she specifically complains that the State's evidence was not sufficient to establish "but for" causation, Galloway admits on appeal that the existence or nonexistence of a causal connection is a question for the jury's determination.

Viewing the evidence in the light most favorable to the verdict, we hold that the jury could have reasonably inferred that Galloway put the baby at a substantial risk of death when she failed to provide medical care after delivering him and instead left him in the toilet for five minutes after he was born. Or the jury could have reasonably inferred that the baby suffered serious bodily injury because Galloway did not seek medical treatment for the baby after leaving him on the floor without being covered and seeing him struggle to breathe. And, as the factfinder, the jury could have believed parts of the various versions Galloway had told about the birth of the baby and disbelieved other parts. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."); *Ireland v. State*, No. 02-17-00214-CR, 2018 WL 2344660 at *3 (Tex.

App.—Fort Worth May 24, 2018, pet. ref'd) (mem. op., not designated for publication) ("[T]he factfinder may believe all, part, or none of a witness's testimony."); *see also Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981) (reasoning that jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to witness testimony); *Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (stating that the jury may choose to believe or disbelieve any part of a witness's testimony).

Lastly, Galloway gave a great deal of false and conflicting testimony in her interviews, which were admitted into evidence, and jurors may infer guilt from this testimony. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Attempts to conceal incriminating evidence, inconsistent statements, and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt."). This testimony included hiding the baby in the bathroom cabinet and denying giving birth. In addition, she also offered conflicting testimony regarding how long the baby was in the toilet, whether and how much the baby cried, and whether or not the baby was covered while on the floor. Therefore, we hold that a rational trier of fact could have found that Galloway committed the offense of knowingly by omission causing serious bodily injury to a child. *See Jackson*, 443 U.S. at 318–20, 99 S. Ct. at 2787; *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Accordingly, because the evidence is sufficient to support the jury's verdict, we overrule Galloway's first point.

17

## B. Point No. 2 – Incorrect Culpable Mental State

In her second point, Galloway complains that her Judgment of Conviction sets forth the incorrect culpable mental state for which she was convicted. She argues that while the indictment and Court's Charge alleged only conduct committed knowingly, and the jury verdict form signed by the presiding juror stated only a finding of knowing conduct, the judgment states that the jury also found that the conduct was committed intentionally. The State agrees.[5]

### 1. Applicable Law

Texas Rule of Appellate Procedure 43.2(b) allows an appellate court to "modify the trial court's judgment and affirm it as modified." Tex. R. App. P. 43.2(b). An appellate court has the power to reform an incorrect trial court judgment to "make the record speak the truth when the matter has been called to its attention by any source." *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (citing *Asberry v. State*, 813 S.W.2d 526, 531 (Tex. App.—Dallas 1991, pet. ref'd)).

### 2. Analysis

The Judgment of Conviction by Jury states that Galloway was convicted of "Injury to a Child – Intentionally and Knowingly Cause Serious Bodily Injury or

---

[5]The State's confession of error in a criminal case is important and carries great weight, but it is not binding. *See Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002). We are required to independently examine the error confessed because the proper administration of the criminal law cannot be left merely to the stipulation of parties. *Id.*; *Gallegos v. State*, No. 08-14-00275-CR, 2015 WL 8334835, at *2 (Tex. App.—El Paso Dec. 9, 2015, no pet.) (not designated for publication).

Serious Mental Deficiency, Impairment or Injury." However, the indictment stated only that Galloway "did knowingly, by omission, cause serious bodily injury to [the baby] . . . by failing to seek medical care . . . ." Further, the charge did not instruct the jury on "intentionally." Finally, the verdict form, signed by the presiding juror, stated that the jury found Galloway "guilty of the offense of knowingly causing serious bodily injury to a child by omission as charged in the Indictment."[6]

The judgment inaccurately reflects that Galloway was convicted of intentionally causing serious bodily injury to a child by omission. Therefore, we sustain Galloway's second point and modify the judgment to delete the word "intentionally" from the description of the "Offense for which Defendant Convicted." Accordingly, we modify the judgment to reflect that the conviction was for knowingly, not intentionally, causing serious bodily injury to a child.

## IV. CONCLUSION

Having overruled Galloway's first point challenging the sufficiency of the evidence and having sustained her second point and having deleted the word "intentionally" from the judgment, we affirm the judgment as modified.

---

[6]In addition, the verdict form allowed the jury to find Galloway "guilty of the [lesser-included] offense of recklessly causing serious bodily injury to a child by omission."

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 23, 2019

20