# Court of Appeals
## Tenth Appellate District of Texas

10-24-00004-CR

Chad Wayne Gillen,
Appellant

v.

The State of Texas,
Appellee

On appeal from the
443rd District Court of Ellis County, Texas
Senior Judge David W. Evans, presiding
Trial Court Cause No. 49952

CHIEF JUSTICE JOHNSON delivered the opinion of the Court.

## MEMORANDUM OPINION

A jury found Appellant Chad Wayne Gillen guilty of the offense of murder and assessed his punishment at seventy years' confinement. In his sole issue, Gillen argues that the trial court erred by refusing to include instructions to the jury on lesser included offenses. We affirm.

## A. Background Facts

Gillen lived with his mother, Karen, and helped care for her after his father's death. In February 2012, Karen went to a neighbor's house and said she was freezing because Gillen would not turn on the heat. Karen stayed the weekend with her neighbor but returned home on Sunday. Karen returned a few days later with a black eye and said that Gillen had hit her. A few days after that, she returned and said that Gillen had broken her arm. The neighbor called the police, and ultimately Gillen pleaded guilty to assaulting Karen. As a result of the assault, Karen was unable to care for herself and was placed in a care facility.

Karen eventually left the care facility and moved into an apartment with a private caregiver. While living with her caregiver, Karen began having visitation with Gillen. The visitation progressed to where Karen would spend the night with Gillen but return to stay with the caregiver during the day. One day Karen returned to the caregiver after staying with Gillen, and she had a bruise. Karen told the caregiver that Gillen had caused the bruise. The caregiver had observed Gillen intentionally hurt Karen in the past by purposely stepping on her toe. In 2015, Karen left the caregiver and returned to her house to live with Gillen.

Gillen and Karen regularly attended church after she returned home. People at church noticed occasional bruising on Karen but did not observe anything out of the ordinary for an elderly person. The church pastor was more troubled by Karen's weight loss and frail appearance than any bruising. When the COVID pandemic struck in the spring of 2020, church services were suspended, and few people saw or spoke to Karen after that.

On September 23, 2020, Gillen took Karen to a local hospital. He left Karen in the car and went inside to get help. Courtney Dansby, an ER nurse at Baylor Scott and White, went with Gillen to his vehicle and observed that Karen was very cold and her body was stiff. Karen was rushed to a room, but no CPR or interventions were performed. Karen had a body temperature of 92.2 degrees, and she weighed 80 pounds. Dansby stated that Karen had numerous injuries including multiple bruises on her face and forehead as well as a laceration on her nose. Her right shoulder appeared to be broken or dislocated. She had multiple bruises and skin tears on her arms. Karen also had bruising on her back and ribcage area. Gillen told Dansby that Karen was breathing on the way to the hospital, but Dansby believed that Karen had been dead for some time. According to Dansby, Gillen was very calm and "nonchalant." She described his behavior as odd for a person with a critically ill family member.

Dr. Dustin Corgan was working in the ER when Karen arrived. He described the whole situation as unusual because he was called to pronounce Karen dead rather than perform life-saving measures. According to Dr. Corgan, Gillen's description of what had happened was not consistent with what he observed when viewing Karen's body. Gillen stated that he was upstairs and heard a thud. He came downstairs to find that his mother had fallen, but she was still alive. He took her to the hospital, three miles from their house, and she became unresponsive en route. Upon arrival at the hospital, nurses went to Gillen's car and found Karen's deceased body in the car. When he initially saw Karen, Dr. Corgan observed that she had been dead longer than a few minutes. Because of the unusual circumstances, the police were called to come to the hospital.

Waxahachie Patrol Sergeant Corey Kaelin responded to the call from the hospital. Sergeant Kaelin observed multiple injuries on Karen. Sergeant Kaelin spoke to Gillen at the hospital, and he was cooperative. The interview was continued at the police station. Gillen told police that he had left the house around 1:00 to go to the mall. He returned around 4:00 and asked Karen if she would like to eat. Karen said she would eat after Gillen returned from church. Gillen returned home from church around 8:00 and fed Karen. He then bathed her and put her on the couch where she slept. He went upstairs to shower, and

he heard a thud. He returned to find Karen on the floor. Gillen put Karen in the car and took her to the hospital. On the way to the hospital, Karen slumped over.

After interviewing Gillen at the police station, Sergeant Kaelin and Corporal Meagan Gonzalez went with Gillen to his house. According to Sergeant Kaelin, the house was filthy and smelled of urine. The couch where Karen slept was stained with dried blood and smelled of urine. There were also blood stains on the walls of the house. Sergeant Kaelin measured that the couch was approximately eighteen inches off of the ground.

The officers found a broken broom handle at the residence that had a jagged edge. The broom handle appeared to have blood, hair, and skin particles attached to it. The officers sent the broom handle for testing. Testing conducted on the broom handle was positive for blood. Testing further revealed that Karen was 14.2 quadrillion times more likely to be the source of the DNA found on the broom handle than the probability of an unrelated, unknown source.

Gillen told the officers that Karen bumped into the walls with her wheelchair causing the bruises and cuts on her arms. He explained the bruises on Karen's face occurred when she fell off of the couch on more than one occasion. He admitted to the police officers that he had punched Karen in the

stomach when she would not eat and that he bit her on the forehead. He also confessed that two weeks before her death, he struck Karen in the arm, shoulder, and possibly her head. He also stated that he had hit her in the face.

Dr. Allison Cooper performed an autopsy on Karen. Dr. Cooper testified that Karen was underweight and appeared older than sixty-eight years old. Dr. Cooper observed that Karen was frail and had multiple injuries that were evident. Dr. Cooper described the injuries to Karen's face and head. She noted that Karen suffered multiple blunt force injuries to the head. Karen had a bed sore on her back and areas of hemorrhage on her back and right buttocks. Dr. Cooper noted that Karen had bruises and skin tears on her arms as well as multiple bruises on her legs. Dr. Cooper further explained that Karen had a severe injury to shoulder and upper arm.

Dr. Cooper testified that Karen suffered a traumatic injury to her brain. She stated that her brain injury was not consistent with a small fall but required more force such as being hit in the head with something or being in a motor vehicle accident. According to Dr. Cooper, the brain injury would have at a minimum put Karen in a comatose state if not death. Dr. Cooper also testified that Karen suffered a severe abdominal injury. Karen had 290 milliliters of liquid and clotted blood inside of her abdominal cavity. Dr. Cooper said that her abdominal injury was caused by severe force.

Dr. Cooper consulted with Dr. Christian Crowder, a forensic anthropologist, to assess Karen's skeletal injuries. Dr. Crowder determined that Karen had twenty-one rib fractures in various stages of healing. Dr. Crowder said that three of the rib fractures were recent. According to Dr. Crowder, at least three traumatic episodes caused the rib fractures. Dr. Crowder explained that the bone in Karen's upper arm was fractured into many pieces. Dr. Crowder attempted to reconstruct the bone in Karen's arm, but not all of the pieces were recovered. He said that her body may have reabsorbed some of the pieces. The break in Karen's arm caused a dislocation in her upper arm and shoulder.

Dr. Cooper concluded that Karen's manner of death was homicide caused by blunt force injuries. She testified that Karen's injuries were not consistent with a single fall. She determined that Karen's death was caused by a combination of all of her injuries.

Gillen called Sheryle Wolfe, his neighbor, to testify. According to Wolfe, part of Karen died when her husband died, and she just wanted to be with him. Wolfe said that Karen caused her bruises and that she would injure herself by falling or bumping into furniture. Wolfe described an incident when Karen fell while using her walker. While helping stabilize Karen, Wolfe grabbed a broom handle. She said that both she and Karen cut themselves on the walker and

the broom handle. Wolfe testified that Karen hurt her shoulder when she fell off the couch. Wolfe last saw Karen three to four weeks before she died. She said Karen was very thin and that "the light bulb was on, but nobody was home." She told Gillen at that time that he needed to get Karen to a doctor, but Gillen said that Karen refused to go to the doctor.

Gillen called other witnesses who observed that Karen was very thin. The witnesses did not notice any bruising that was out of the ordinary for an elderly person.

## B. Issue One

In his sole issue, Gillen argues that the trial court erred by refusing to include lesser included offenses in the jury charge. Gillen was charged pursuant to the felony-murder statute. That statute provides that a person commits the offense of murder if he:

> commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3). The indictment alleged that Gillen committed an act clearly dangerous to human life while in the course of committing injury to an elderly individual.

A person commits the offense of injury to an elderly individual if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes serious bodily injury or bodily injury to an elderly individual. TEX. PENAL CODE ANN. § 22.04(a)(1)(3). The statute further defines the applicable punishment ranges including a first-degree felony or a third-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(e)(f).

Gillen specifically argues that the trial court erred by refusing his requested instructions to the jury for the lesser-included offenses of first-degree injury to an elderly individual and third-degree injury to an elderly individual.

1. Authority

We apply a two-part analysis to determine whether a defendant is entitled to an instruction on a lesser-included offense. *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017). We begin by determining whether the offense in the requested instruction is a lesser-included offense of the charged offense. *Id.* If it is, then we must decide whether a jury could, based on the admitted evidence, rationally find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Id.*

An instruction on a lesser-included offense is required only when there is some admitted evidence directly germane to that offense. *Id.* We consider all admitted evidence without regard to the credibility of the evidence. *Id.* An instruction is required if more than a scintilla of evidence establishes "that the lesser-included offense is a valid, rational alternative to the charged offense." *Id.* (citing *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011)).

An affirmative answer to the guilty-only question requires evidence excluding guilt of the greater offense and demonstrating that the defendant is guilty exclusively of the lesser-offense. *Green v. State*, 713 S.W.3d 865, 875 (Tex. Crim. App. 2025) *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012). The evidence must negate an element of the greater offense. *Id*. at 876. A jury's ability to disbelieve evidence of the greater offense does not satisfy the guilty-only test. *Id.*

2. Discussion

The State argues that Gillen has not preserved his complaint. To preserve error with respect to a requested instruction on a lesser-included offense, "the defendant must point to evidence in the record that raises" it. *Green*, 713 S.W.3d at 875. (citing *Williams v. State*, 662 S.W.3d 452, 462 (Tex. Crim. App. 2021)). That is, he must specify the evidence that negates the greater offense and supports the lesser. *Id.* Absent that specificity, any error

in refusing the instruction would be preserved only if the specific evidence raising the lesser-included instruction "is manifest." *Id.*

During the charge conference, Gillen requested instructions on the lesser-included offenses of first-degree injury to an elderly individual and third-degree injury to an elderly individual. The State objected to inclusion of the lesser-included instructions, arguing that there was no evidence that Gillen could be guilty of injury to the elderly but not of murder. Gillen's trial counsel responded:

> Yes, Judge. We are asking for both of those lesser included offenses. If you look at what the offense of intentionally or knowingly causing serious bodily injury to an elderly individual and the definition of serious bodily injury being bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of -- impairment of the function of any bodily member or organ, I believe that that's the offense, right, because he could also be charged and found guilty of causing serious bodily injury, meaning the injuries causing her -- her death.
>
> So under that scenario, there'd be -- there would never be any time that there was an injury to an elderly that causes death. It's -- it's automatically going to be a felony murder then. And I don't think that's what the legislature intended.
>
> So I think the jury could find that he -- and it's also a result of conduct issues. So they have to find that he intended to cause serious bodily injury or he knew he was causing serious bodily injury. I believe they can also find that he intended to cause bodily injury only or intended to cause or knowingly caused bodily injury, not necessarily intent of -- of the other. So I -- I think both of those should be included, Judge, as lesser included options for the jury.

Gillen argued that because serious bodily injury to an elderly individual is defined as bodily injury that creates a substantial risk of death or that causes death, he could also be charged and found guilty of only that offense. He maintained that the legislature did not intend for an injury to an elderly individual that causes death to automatically be a felony murder. However, Gillen did not identify evidence in the record that negates the offense of murder and supports the lesser-included offense of injury to an elderly individual. *See Green*, 713 S.W.3d at 875. On appeal, he maintains that there "was evidence in the record that suggested [Karen's] injuries were caused by falling." However, he did not identify that evidence to the trial court during the charge conference or in his appellate brief. Therefore, because the specific evidence raising the lesser-included offenses is not "manifest," we agree that Gillen did not preserve his complaint. *See id*.

Moreover, even if he preserved his complaint, the trial court did not err by denying the requested instructions. The State agrees first and third-degree injury to an elderly individual qualify as lesser-included offenses under the law and contends that we only need to determine whether there is evidence from which the jury could rationally find that, if he is guilty, Gillen is only guilty of injury to an elderly individual.

Gillen first argues that there was no evidence that his actions were an act clearly dangerous to human life. We disagree. Dr. Cooper testified that Karen suffered a severe abdominal injury. She said that such an injury required a significant amount of force. Gillen admitted to the police officers that he punched Karen in the stomach on more than one occasion. In addition, Dr. Cooper testified that Karen suffered a traumatic brain injury caused by a large amount of force. The State presented evidence that a broom handle found inside of the home contained Karen's blood and also contained hair fibers. The jury could rationally have determined that Gillen committed an act clearly dangerous to human life by punching and striking Karen. *See Fountain v. State*, 401 S.W.3d 344, 358 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Gillen next argues that there was evidence in the record that Karen's injuries were caused by falling. There was uncontradicted evidence that Karen died as a result of blunt force injuries. Dr. Cooper specifically testified that a fall from around one foot would not cause Karen's injuries. She emphasized that Karen's injuries were not consistent with a single fall and that Karen's death was caused by significant force.

Gillen's trial counsel asked Dr. Cooper to identify which of Karen's injuries could have resulted from a fall. Dr. Cooper could not attribute a specific injury to a fall. While there was evidence that some of the bruises and

injuries on Karen could have been caused by bumping into the walls and falling, that evidence does not support a finding that Gillen was only guilty of either of the lesser-included offenses of injury to an elderly individual. Dr. Cooper testified that Karen's death was caused by blunt force injuries that were not consistent with a fall. Accordingly, there is no evidence that Gillen was only guilty of the lesser-included offenses of injury to an elderly individual. *See Green*, 713 S.W.3d at 875. We overrule Gillen's sole issue.

C. Conclusion

We affirm the trial court's judgment.

_____

MATT JOHNSON
Chief Justice

OPINION DELIVERED and FILED: December 30, 2025

Before Chief Justice Johnson,
    Justice Smith, and
    Justice Harris
Affirmed
Do Not Publish
CRPM

